UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RONALD A. FAVIER,

          Plaintiff,

vs.

MAYNARD COUNTRY CLUB,

          Defendant.

Docket No. 04-12540MLW

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to United States District Court Local Rule 56.1, the Defendant Maynard Country Club hereby provides its statement of material facts not in dispute in support of its motion for summary judgment:

1. Maynard Country Club is a semi-private, 9 hole golf course golf club located in Maynard, Massachusetts that is overseen and managed by a volunteer Board of Governors (the "Board"). (Affidavit of Michael Kaminski, ¶ 1)[1]

2. Mr. Favier was hired by the Club as the General Manager ("GM") in January 2000. (Deposition of Ronald A. Favier, October 29, 2003, at p. 8.)[2]

3. Mr. Favier was age 52 when he was hired and age 55 when his employment was terminated. (Kam. Aff. ¶3)

---

[1] Hereinafter, "Kam. Aff. ¶___."

[2] Hereinafter, " Pl. Dep. at ___." A true copy of the transcript of Mr. Favier's deposition is annexed to the Affidavit of Attorney Carrie J. Campion ("Campion Aff.") as Exhibit 1.

BOS1441010.1

4. Mr. Favier executed an at-will employment agreement setting forth the terms of his employment for a period of up to five years. The at-will employment agreement contained a 30-day notice termination clause. A true copy of the Employment Agreement between the Maynard Country Club and Ronald A. Favier is attached to the Kam. Aff. as Exhibit 3.

5. The Club never employed twenty (20) or more employees for twenty or more weeks during Mr. Favier's employment. (Kam. Aff. ¶ 15)

**Mr. Favier's Repeated Threats to Quit**

6. Mr. Favier offered his resignation on the first day of his first golf season with the Club. "I offered my resignation…right when I started". (Pl. Dep. at 131)

7. In April 2002, even before the new Board took office, Mr. Favier offered his resignation to his supervisor, the House Committee Chairperson. (Pl. Dep. at 142)

8. In the Summer of 2002, Mr. Favier offered his resignation because he was working too many hours, and was asked to "do all these reports". Further, he stated that "if things keep up, you know, I can't work under these conditions." (Pl. Dep. at 132)

9. Mr. Favier offered his resignation when working under each of his House Committee Chairpersons. (Pl. Dep. at 131, 132, 142)

10. Over the span of nine months from April 2002 through December 2002, Mr. Favier threatened to quit his job numerous times, including at least twice to Mr. Kaminski (Kam. Dep. at 56-57, 194), two times to Ms. Ford (Deposition of Joan Ford, dated January 12, 2004 at 18)[3], and in writing to Peter Boeing (former House Committee Chairperson). *See* letter

---

[3] Hereinafter, "Ford Dep. at _" A true copy of Ms. Ford's deposition transcript is annexed to the Campion Aff. as Exhibit 2.

dated April 11, 2002 from Ronald A. Favier to Peter Boeing, annexed to the Campion Aff. as Exhibit 5.

11.   At no time in connection with these threats to quit, did Mr. Favier state that he believed he was being discriminated against on account of his age, or any other basis. (Kaminski Aff. ¶ 21). On each occasion, his stated reason for quitting related to the demands of his job. (Pl. Dep. at 132)

### The Board of Governors

12.   The Board of Governors (the "Board") met monthly to discuss any issues related to the Club, receiving status reports from various individuals regarding the operations and financial health of the Club. (Kam. Aff. ¶ 5)

13.   At Board meetings, the full Board was presented with status reports on the activity and finances of the House (the main Club, excluding the golf course). (Kam. Aff. ¶¶ 5-6)

14.   The status reports were intended to present the Board with a picture of the activity, operations and financial health of the House. The status reports were relied upon by the Board in making business decisions regarding the overall success and profitability of Club activities. (Kam. Aff. ¶ 7)

15.   Prior to the new Board elections in 2002, the House Committee Chairperson never requested that Mr. Favier prepare any types of financial reports, rather leaving it to Mr. Favier's discretion what financial reports he chose to present. (Deposition of Michael Kaminski, November 6, 2003[4], at 74-75; Kam. Aff. ¶ 8)

---

[4] Hereinafter, Kam. Dep. at __. A true copy of the transcript of Mr. Kaminski's deposition is attached to the Campion Aff. as Exhibit 3.

16. While under Mr. Boeing's supervision, Mr. Favier admitted that his assistant manager probably "knew more about managing then I do" [sic] and, that " I may not be a good manager." (*See* 5/13/01 letter from Ronald A. Favier to Dawn Anderson dated May 13, 2001, attached to the Campion Aff. as Exhibit 6)

17. The Board is elected by the Club's membership. In April 2002, the Club held elections for the Board's President and Treasurer. The membership elected a new President (Michael Kaminski) and new Treasurer (Joan Apkin). (Kam. Dep. at 11)

18. When the new Board was elected in 2002, Mr. Favier's relationship and interaction with the Board changed "dramatically." (Pl. Dep. at 40)

19. The new executive board members were committed to bringing the operations of the Club to a higher level of professionalism and business standards, with a renewed dedication to running a cost efficient club and with particular attention to lowering the existing debt and implementing new procedures and policies to attain these goals. (Kam. Dep. at 149) *See* also copy of Board members' ideas regarding moving the Club in a more professional direction, attached to the Campion Aff. as Exhibit 7. Mr. Favier was aware of the new direction in which Mr. Kaminski and the Board wanted to take the club. (Pl. Dep. at 43)

20. Mr. Kaminski, as President of the Club, appointed a new House Committee Chairperson. Jane Ford, a general Board member. (Kam. Dep. at 32, 33; Kam. Aff. ¶ 7) In addition to her supervisory role over Mr. Favier, Ms. Ford was responsible for working cooperatively with the new Treasurer, Joan Apkin, to identify ways that the Club could run more cost effectively and efficiently. As a result of this, both she and Ms. Apkin were required to work closely with, and to scrutinize, Mr. Favier's job performance to achieve these business goals. (Kam. Aff. ¶ 7)

## The Criticisms of Mr. Favier's Job Performance

21. According to Mr. Favier, he was "criticized all the time" by the new Board. He testified that "there was just a feeling that I couldn't do anything right there, you know." (Pl. Dep. at 42)

22. One at least one occasion, Mr. Favier was counseled by Ms. Ford that he did not have adequate house staff. (Pl. Dep. at 135)

23. On another occasion, Ms. Ford counseled Mr. Favier that he did not properly manage the preparations for a large member function. (Pl. Dep. at 142)

24. On yet another occasion, at a club members' luncheon, Ms. Ford and Ms. Apkin updated members regarding the performance of Club employees. They mentioned employees by name who were doing a great job and did not mention Mr. Favier's name. Mr. Favier was present to hear these remarks. (Pl. Dep. at 42)

25. Ms. Ford assumed some of Mr. Favier's responsibility of providing the Board with status reports on the House. (Kam. Aff. ¶ 11) Mr. Favier was responsible for preparing financial reports regarding the activities of the House so that she could prepare the report for the Board. (Kam. Aff. ¶ 11)

26. Ms. Ford started demanding "a lot" of reports from Mr. Favier and he testified that he "couldn't deliver them as quickly as she wanted them." When asked why Ms. Ford may have "piled on" reports, Mr. Favier testified that he "couldn't go inside her head" and that he "really [didn't] know." (Pl. Dep. at 68)

27. Mr. Favier did not complete the reports as requested, and when he asked for a delay of the Board's expectation until after the golf season, the Board did not want to wait for the financial reports and "kept the pressure on". (Pl. Dep. at 42)

28. Instead of preparing the report as directed, Mr. Favier instead stated, "I'll get it to you when I can" or "Why do you need it now?" (Kam. Dep. at 65-66)

29. When Ms. Ford directed Mr. Favier to provide her with information or reports, "If I [Mr. Favier] thought it was wrong, what she requested, I stated that I didn't think it was right." Mr. Favier acknowledged that this practice "didn't add to the pleasantries of the situation." (Pl. Dep. at 40) The reports Mr. Favier did prepare inaccurately calculated the Club's operating costs. (Kam. Dep. at 70-71)

30. In October 2002, Ms. Ford counseled Mr. Favier that he had broken the Club's safety policy by allowing golfers to tee off from the first and fourth tees at the same time. (Pl. Dep. at 70-72)

31. Ms. Ford counseled Mr. Favier regarding maintaining the golf carts in a new location because of insurance liability issues. (Pl. Dep. at 66)

32. Nearly all of Mr. Favier's management reports were incomplete and/or inaccurate, including reports reflecting the financial results of various Club functions and tournaments. (Kam. Dep. at 68-69)

33. Mr. Favier testified that he believed Ms. Apkin "didn't think [he] ran a good restaurant, a good lounge, good bar, didn't get enough money for [his] things." (Pl. Dep. at 82) He acknowledged that "we [Mr. Favier and the Board] may have had differing viewpoints" regarding the financial aspects of running the Club. *Id.*

34. Employees made complaints to Mr. Kaminski regarding Mr. Favier's management of the Club. Specifically, the Club's cook complained about Mr. Favier's lack of direction, and a pro-shop employee complained that Mr. Favier constantly changed her hours and reprimanded her while allowing others to get away with the same conduct. (Kam. Dep. at 95-96)

Additionally, Ms. Ford was concerned with allegations that Mr. Favier was having an affair with one of his employees, which she considered unprofessional behavior. (Ford Dep. at 34) Further, Mr. Kaminski was concerned that Mr. Favier did not adequately handle difficult or confrontational situations with employees or members. He believed that Mr. Favier had a difficult time when asking members to follow the rules and when disciplining employees. He also believed that Mr. Favier was not respected by the Club's employees. (Kam. Dep. at 85-86)

35. Ms. Ford and Ms. Apkin confronted Mr. Favier in August 2002 regarding a complaint they received regarding his management of the Club. Mr. Favier refused to comply with their request that he prepare a written response to the allegations. (Pl. Dep. at 80-81)

36. Ms. Ford testified that Mr. Favier did not understand the basic concept of pricing items. (Ford Dep. at 15) Prices of Club items (such as food and alcohol) consistently fell below the market rate charged by similar clubs and restaurants in the area because Mr. Favier did not factor in the cost to buy and service the item when setting the item's price. (Kam. Dep. at 70) Mr. Favier's inability to allocate the cost of items resulted in a loss of profits to the Club. (Ford Dep. at 14-15)

37. In the golf season of 2002, Mr. Kaminski personally observed that Mr. Favier would complain to Board members when they requested that he prepare reports, make a repair, or replace fire detectors, stating that he did not have the time to complete the requests. (Kam. Dep. 76-78)

38. Mr. Kaminski also observed that Mr. Favier, who was responsible for maintaining the security of the Club's two safes, hung the key to one safe on a hook which was accessible to anyone inside the Club's office, and he kept the combination for the other safe posted in a location visible to anyone inside the Club's office. (Kam. Dep. at 67, 78, 82-83)

39. Mr. Favier attempted to provide raises to staff employees without the appropriate authorization from Ms. Ford. Mr. Favier made promises to his staff that he would get them pay raises even though Ms. Ford never said to Mr. Favier that pay increases were in the budget. As a result, Mr. Favier caused an employee to quit because he did not receive the raise Mr. Favier led him to believe he would receive. *See* e-mail between Jane Ford and Ronald A. Favier, with copy to Michael Kaminski, dated September 25, 2002 attached to the Kam. Aff. as Exhibit 2.

40. Mr. Favier was not following the Board's budget appropriately. Joan Apkin requested that Jane Ford counsel Mr. Favier to properly adhere to budget line items and not use budget resources allocated for an Assistant Manager for regular course wages. *See* e-mail from Joan Apkin to Jane Ford, dated October 2, 2002 attached to the Campion Aff. as Exhibit 8.

41. Mr. Kaminski discussed Mr. Favier's performance deficiencies with him formally on one occasion and informally on numerous occasions. (Kam. Dep. at 183-184) In particular, in the summer of 2002, Mr. Kaminski discussed with Mr. Favier his inability to handle management issues on his own, and to accept ownership for problems within the Club. He also discussed with Mr. Favier his spreading rumors among Club members and employees, and his discussing confidential Club matters in front of Club members. (Kam. Dep. at 100-101, 103, 113)

## Mr. Favier Is Overwhelmed by the New Board's Requirements

42. By April 11, 2002, almost immediately after the new Board was elected, Mr. Favier was "unhappy" with his position and "frustrated at being micromanaged" (Pl. Dep. at 148)

43.     In May or June of 2002, Mr. Favier complained he was working too many hours and that it was not right. (Pl. Dep. at 134) Around the same time, he told Mr. Kaminski that he felt overburdened. (Pl. Dep. at 53-54)

44.     Mr. Favier also complained to members that the work demands placed on him by the Board were causing him anxiety and were causing him to work longer hours than he was capable of working. (Kam. Dep. at 102-103)

45.     Shortly thereafter, Mr. Kaminski moved Mr. Favier's House Committee report to the first item on the Board meeting's agenda so that Mr. Favier could leave early. (Pl. Dep. at 53-54)

46.     Mr. Favier informed Ms. Apkin on May 5, 2002 that he had submitted his resignation stating that he could not "take" the "oversight" and "member pressure" anymore. *See* e-mail from Jane Apkin to Board members, including Michael Kaminski, dated May 5, 2002 attached to the Kam Aff. as Exhibit 4.

47.     In response to a criticism by Ms. McKean, a general Board member, regarding Mr. Favier's management of a Championship Golf Tournament at the Club (regarding the prizes that were awarded), he responded "I guess we could have offered every one a new car or a mink coat, but seeing as there was no entry fee to participate, I think that the club was very generous." "I have personally become despondent over the never ending, constant complaining, about every little thing that goes on here. For reasons that I don't know, you have been riding Rick [an employee of the Club] hard all year, and I think it is unfair. There is never one time that we cross paths that you don't have a complaint about something or someone here. Please take all your future complaints to [the House Committee Chairman]. I can no longer deal with them."

*See* e-mail from Ronald A. Favier to Janet McKean dated August 22, 2001 attached to the Campion Aff. as Exhibit 9.

### Mr. Favier's Termination

48. The Board concluded that Mr. Favier lacked the managerial skills necessary to effectively handle difficult or confrontational employment situations, as well as the skills and willingness to assist the Board usher in new professional and business standards for the Club. (Kam. Aff. ¶ 15)

49. The Board held an executive session in October 2002 to vote on whether to exercise the termination clause in Mr. Favier's employment agreement. (Ford Dep. at 10; Kam. Dep. at 16) Of the nine voting members on the Board, eight attended the executive session (ages 39, 41, 49, 50, 54, 58, 65 and 80) and voted by secret ballot. The members voting included: Jane Ford (age 41), Joan Apkin (age 49), Janet McKean, Jane Audrey Neuhauser, Michael Cardillo, Ted Bubier, Pauline Hendrix, and Bob Sweeney. (Kam. Dep. 19) Mr. Kaminski attended the meeting as well, and participated in the discussion (Kam. Dep. at 51-53)

50. The Board entered into substantial discussion prior to voting on whether to terminate Mr. Favier's employment agreement. It was a very difficult decision for the Board because while the Board believed, and discussed, the serious concerns they had in several areas of Mr. Favier's responsibility, including that he lacked the skills to execute his responsibilities appropriately, he was well liked by the membership. (Kam. Dep. at 52-53; Kam. Aff. ¶ 17)

51. Mr. Kaminski did not recall any discussion of Mr. Favier's age during the substantial discussions leading up to the vote . (Kam. Dep. at 55)

52. Among the concerns discussed by the Board was Mr. Favier's numerous threats to quit his job. (Kam. Dep. at 55-56)

53.     Ultimately, the vote resulted in seven votes in favor of terminating Mr. Favier's employment contract, and only one vote against termination. (Kam. Aff. ¶ 13)

54.     Mr. Kaminski informed Mr. Favier on December 16, 2002 that the Board had voted to exercise the Agreement's 30-day termination clause, and to terminate his employment. (Kam. Aff. ¶ 13, Exhibit 4; Kam. Dep. at 147-148)

55.     Mr. Favier testified that he was not the only club employee who was criticized for his unsatisfactory work (Pl. Dep. at 37-38, 59), and that many employees resigned during Ms. Apkin's tenure as Treasurer because Ms. Apkin was a difficult boss. (Pl. Dep. at 38) In addition, he acknowledged that Ms. Ford's criticism may have stemmed from her desire to make the Club function better. (Pl. Dep. at 66-67)

### Mr. Favier Never Complained of Age Discrimination

56.     Since the Club employs a relatively small number of employees it does not maintain any formal policies regarding reporting perceptions of discrimination. (Kam. Aff. ¶ 16) However, the President maintains an open door policy and lets each employee know that he or she is free to speak directly with him regarding any perceived problems, including discrimination. (Kam. Aff. ¶ 20)

57.     Mr. Favier never complained about age discrimination during his employment with the Club. (Pl. Dep. at 137)

58.     In fact, Mr. Favier complained to Mr. Kaminski quite often from April 2002 up through his termination regarding his work situation. During those conversations he complained that he felt he was working too many hours, was asked to prepare too many reports, was pulled in too many directions, was frustrated by being micromanaged and was being criticized

Case 1:04-cv-12540-MLW    Document 5    Filed 12/06/2004    Page 12 of 13
- 12 -

persistently. Yet during all of the conversations, he never once expressed a belief that he was being treated differently or being discriminated against because of his age. (Kam. Aff. ¶ 21)

59. At no time during Mr. Favier's termination meeting did Mr. Favier mention to Mr. Kaminski that he felt he was being terminated or was treated differently because of his age. (Kam. Aff. ¶ 17)

60. Rather, Mr. Favier testified that he did not believe any action taken by the Board, as to him, except for his actual termination, was taken on account of his age. (Pl. Dep. at 96-98)

61. Mr. Favier admitted in his sworn testimony that he had no reason to believe that age was a motivating factor in the Board's termination of his employment, but "assumed it was [his] age, for lack of another reason." (Pl. Dep. at 97, 110-111)

62. Mr. Favier stated at his deposition that he believed he was terminated because of his age because Mr. Kaminski told him that the Club was going in a "new direction". And in his mind, "if that was new and I was going and I was old" then "I assumed I was the old way." (Pl. Dep. at 99)

63. Mr. Favier stated that he understood that the Board "didn't want [him] as a GM" because "they had other ideas for the club." That is, the Board was going to take the Club "in a new direction" and "I apparently wasn't part of the new direction" (Pl. Dep. at 43-44) Mr. Favier, however, has "no certain knowledge" of why the change occurred. (Pl. Dep. at 44)

64. Mr. Favier testified that, "there's a possibility I suppose that they were trying to help the club and they saw all these things as being truthful and essential and must be changed." (Pl. Dep. at 63) Further, when asked why the Board would have wanted somebody else in the GM position, the Mr. Favier stated, "Maybe personality conflicts. Maybe I wasn't their cup of tea." (Pl. Dep. at 63-64)

65.     Both Ms. Apkin and Ms. Ford are over forty, and Ms. Ford is within a few years of Mr. Favier's age. (Kam. Aff. ¶ 13)

66.     Mr. Favier's job as General Manager was eliminated after his termination. The job responsibilities of the General Manager were absorbed into a more expansive position entitled "Business Manager". The Business Manager position is a higher paid position, with the added responsibility of maintaining the golf course. (Kam. Dep. at 44-45; Kam. Aff. ¶ 18)

67.     The Club's Business Manager is an individual with over eighteen (18) years experience in golf course and golf club management, as well as sophisticated skills regarding managing club finances. (Kam. Aff. ¶ 19). *See* Resume of Nathaniel Binns attached to the Kam. Aff. as Exhibit 5. Prior to becoming the General Manager of the club, Mr. Favier, by contrast, had no prior experience managing a golf club. Rather, Mr. Favier had owned and worked in an auto body supply company for at least sixteen years. (Pl. Dep. at 127)

Respectfully submitted,

MAYNARD COUNTRY CLUB

By its attorneys,

_____
David S. Rosenthal (BBO #429260)
Carrie J. Campion (BBO # 656451)
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110-2131
(617) 345-1000

DATED: December 6, 2004