UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **RONALD A. FAVIER,**<br><br>　　　　　　　　**Plaintiff,**<br><br>vs.<br><br>**MAYNARD COUNTRY CLUB,**<br><br>　　　　　　　　**Defendant.** | **Docket No. 04-12540MLW** |

## AFFIDAVIT OF MICHAEL KAMINSKI

Michael Kaminski, on oath, deposes and says:

1.　　I am the President of the Board of Governors (the "Board") that oversees the operations and management of the Maynard Country Club (the "Club"). The Club is a semi-private, 9 hole golf course golf club located in Maynard, Massachusetts. The facts in this affidavit are true to my knowledge.

2.　　I was elected President of the Board in April 2002.

3.　　Ronald A. Favier ("Mr. Favier") was the General Manager of the Club from January 2000 until the termination of his employment in December 2002. He was 52 years of age when he was hired, and 55 when his employment was terminated.

4.　　At the time I took office, the Club was loosely organized, the finances were not in order, and there were not reliable systems in place regarding the operations of the Club. When I was elected President, part of my vision for the Board was to examine thoroughly the operations, management and finances of the Club, and to have the Club run in a more professional and business-like manner.

BOS1441428.1

5. The Board met monthly to discuss any issues related to the Club and received status reports from various individuals regarding the operations and financial health of the Club. At Board meetings, among the status reports presented were status reports on the activity and finances of the House (the main Club, excluding the golf course). The House status reports were intended to present the Board with a picture of the activity, operations and financial health of the House. The status reports were relied upon by the Board to make business decisions regarding the overall success and profitability of Club activities.

6. At the time of my election, Peter Boeing was Vice President and the House Committee Chairperson.

7. I appointed Jane Ford to the position of House Committee Chairperson, replacing Mr. Boeing. She was Mr. Faiver's direct supervisor. In addition to her supervisory role over Mr. Favier, Ms. Ford was responsible for working cooperatively with the new Treasurer, Joan Apkin, to identify ways that the Club could run more cost effectively and efficiently. As a result of this, both she and Ms. Apkin were required to work closely with, and to scrutinize, Mr. Favier's job performance to achieve these business goals.

8. Ms. Ford took over a portion of Mr. Favier's responsibility of providing the Board with status reports on the House. Ms. Ford requested that Mr. Favier provide her with an analysis of certain financial aspects of the House for her reports. These included financial analyses of the Club's events, the profit margin of food and drinks sold by the Club, and the inventory and sales of the Pro Shop. Mr. Favier either failed to provide her with the analysis she required so that she could prepare meaningful financial reports, or he provided her with incomplete or inaccurate reports. Prior to the new Board elections in 2002, the House Committee

Chairperson never requested that Mr. Favier prepare any types of financial reports, rather leaving it to Mr. Favier's discretion what financial reports he chose to present.

9. It became apparent to me that Mr. Favier either failed to understand the importance of providing this information, was incapable of preparing the analyses, or simply refused to provide the analyses to Ms. Ford.

10. Mr. Favier informed Jane Apkin, the new Club Treasurer, on May 5, 2002 that he had submitted his resignation, stating that he could not "take" the "oversight" and "member pressure" anymore. Attached to this affidavit as Exhibit 1 is a true copy of an e-mail from Jane Apkin to Board members and me, dated May 5, 2002.

11. Mr. Favier attempted to provide raises to staff employees without the appropriate authorization from Ms. Ford. Mr. Favier made promises to his staff that he would get them pay raises even though the Board did not tell him that pay increases were in the budget. As a result, Mr. Favier caused an employee to quit because he did not receive the raise Mr. Favier led him to believe he would receive. *See* e-mail between Jane Ford and Ronald A. Favier, with copy to me, dated September 25, 2002, attached to this affidavit as Exhibit 2.

12. The Board collectively determined that Mr. Favier did not seem willing to work with the Board in achieving its goals, nor did he exhibit the necessary skills, including the managerial skills, necessary to effectively handle difficult or confrontational employment situations and the skills and willingness to assist the Board usher in new professional and business standards for the Club. As a result, the Board wanted to terminate Mr. Favier, reshape the position of General Manager into a higher level position called a Business Manager position, and fill it with a Business Manager who shared the same vision for the Club as the Board. We

wanted a manager who could work cooperatively, not combatively, with the Board to achieve its vision.

13.  In an Executive Session in October 2002, the executive committee voted 7-1 to terminate Mr. Favier's employment agreement pursuant to paragraph 6 of that agreement, the 30-day notice termination clause. A true copy of the employment agreement is attached to this affidavit as Exhibit 3. A true copy of the letter from the Board of Governors to Mr. Favier terminating his employment agreement is attached to this Affidavit as Exhibit 4. Of the nine voting members on the Board, eight attended the executive session (ages 39, 41, 49, 50, 54, 58, 65 and 80) and voted by secret ballot. The members voting included: Jane Ford (age 41), Joan Apkin (age 49), Janet McKean, Jane Audrey Neuhauser, Michael Cardillo, Ted Bubier, Pauline Hendrix, and Bob Sweeney. I agreed with the decision and I was 54 years of age. On December 16, 2002, I informed Mr. Favier that the Board had voted to terminate his employment agreement and would pay him thirty (30) days salary.

14.  Mr. Favier was popular with the Club's rank and file members. I liked him personally as well. However, my duty as President and the Board's duty to the membership was to make sure that the Club was being run by a competent, professional and business-like manager. The Board needed to ensure that the General Manager was willing and able to assist the Board in taking the operations of the Club to the next level. Because we concluded that Mr. Favier did not have the skills and was not willing to work cooperatively with the Board to accomplish this goal, the decision to terminate him was necessary.

15.  At no time during Mr. Favier's employment did the Club employ twenty or more people for twenty or more weeks.

4

16. Since the Club employs a relatively small number of employees it does not maintain any formal policies regarding reporting perceptions of discrimination. However, I maintain an open door policy and let each employee know that he or she is free to speak directly with me regarding any perceived problems, including discrimination.

17. Mr. Favier came to me quite often from April 2002 up through his termination to complain to me regarding his work situation. During those conversations he complained that he felt he was working too many hours, was asked to prepare too many reports, was pulled in too many directions, and was frustrated by being micromanaged and criticized by the Board. Yet during all of our conversations, he never once expressed a belief that he was being treated differently or being discriminated against on the basis of his age. Further, at no time during my conversation with Mr. Favier during his termination meeting did Mr. Favier mention to me that he felt he was being terminated or was treated differently because of his age.

18. After Mr. Favier's termination, the Board eliminated the position of the General Manager and created the position of Business Manager. As the position has developed, the Business Manager performs all of the duties of the former General Manager plus he is responsible for the maintenance of the golf course, supervising the Greens' Superintendent.

19. Nathaniel Binns (who I believe to be in his mid-40's), the Club's Business Manager is an individual with over eighteen (18) years experience in golf course and club management, as well as sophisticated skills regarding managing club finances. Attached as Exhibit 5 is a copy of the Nathaniel Binn's resume submitted for the position of Business Manager. Mr. Favier, by contrast, had just less than three years experience at the Club, and no prior golf course or golf club management experience. He had worked previously in an auto parts business. Mr. Favier's experience does not compare to that of Mr. Binns.

20. In recognition of the Board's higher expectations and standards for the Business Manager position, the Business Manager has been offered a significantly higher salary.

21. Mr. Binns, unlike Mr. Favier, has embraced the Board's vision for a greater professional and businesslike approach to managing the Club.

Sworn to under the pains and penalties of perjury this 6th day of December, 2004.

*Michael Kaminski*
Michael Kaminski