UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **RONALD A. FAVIER** | ) |
| Plaintiff, | ) |
|  | ) Docket No. 04-12540MLW |
| v. | ) |
|  | ) |
| **MAYNARD COUNTRY CLUB,** | ) |
|  | ) |
| Defendant. | ) |

## PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS AND RESPONSE TO THE DEFENDANT'S STATEMENT OF ALLEGEDLY UNDISPUTED MATERIAL FACTS

Pursuant to United States District Court Local Rule 56.1, the Plaintiff Ronald Favier hereby provides its statement of material facts in dispute in support of its opposition to the defendant's motion for summary judgment:

### PLAINTIFF'S LIST OF DISPUTED MATERIAL FACTS

1. The defendant's Treasurer Joan Apkin referred several times to Ronald Favier as an "F'ing old bastard." See page 41, lines 18 to 24 of Patricia Triska's deposition testimony, attached as Ehxibit 4 to Attorney Campion's Affidavit.

2. Both Treasurer Apkin and House Committee Chair Ford stated that, "Maybe he is not working because he is too old to do the job,' or things like that." See page 38, lines 1-3 of Triska's deposition, Exhibit 4 to Attorney Campion's Affidavit.

3. The defendant's Treasurer Joan Apkin stated that she believed that Ronald Favier should retire. See page 59, lines 2 to 5 of Patricia Triska's deposition testimony, attached as Ehxibit 4 to Attorney Campion's Affidavit.

4. The House Committee Chairpeson, who was the direct supervisor of Ronald Favier, stated in substance that "At his (Ron's age), he could barely do his own job, never mind

carry on with a young woman." See paragraph five of the affidavit of Patricia Triaks, attached as Exhibit 2 to Attorney Hurley's Affidavit.

5. President Michael Kaminski voted to increase Ronald Favier's salary. See Exhibit 3 of Attorney Campion's Affidvit, Mr. Kaminski's deposition at page 147, lines 1-7.

6. Ronald Favier's accomplishments as General Manger included increased membership, increased revenue, being on or under budget each year, overseeing a reduction in the defendant's debt, and having a clean club house with increased food selections. See Attorney Hurley's Affidavit, Paragraph three of Exhibit 4.

7. When he told Ronald Favier that he was terminated, President Kaminski stated that it was, "time for a change." See the Plaintiff's Deposition, attached to Attorney Campion's Affidavit.

8. Ronald Favier was terminated at the age of 55 years. His replacement was 42 years of age. See Defendant's Motion.

9. Ronald Favier's replacement, Nathaniel Binns, had less experience in managing golf clubs than did Ronald Favier. See Exhibit 5 to Ronald Favier's Affidavit.

10. President Michael Kaminski implicitly praised Ronald Favier's performance on July 1, 2002, by noting that he had received few complaints from club members: "To me, this is the bottom line . . ." See the 6th paragraph of Exhibit 1 to Ronald Favier's Affidavit.

11. President Michael Kaminski implicitly praised Ronald Favier's performance on July 1, 2002, by noting that he had received few complaints from club members: "To me, this is the bottom line . . ." See the 6th paragraph of Exhibit 1 to Ronald Favier's Affidavit.

12. President Michael Kaminski critized the Board of Governors on July 1, 2002, by noting that he had received complaints from club members and employees as to said Board of Governors. See the 7th paragraph of Exhibit 1 to Ronald Favier's Affidavit.

13. On June 24, 2002, House Committee Chair Jane Ford wrote as follows: "Ron present to me a great report about the successful men's member guest. The report detailed and offered actual expenses and profits. See Exhibit 5 of Ronald Favier's Affidavit, paragraph 4.

14. Nobody ever criticized Ronald Favier's handling of club assets while he was employed by the defendant. See Exhibit 4 of Attorney Hurley's Affidavit, particularly paragraph 6 and 8.

15. President Kaminski suggested that Ronald Favier state a deliberate falsehood by denying that he had certain financial records. See Exhibit 4, section 4 of Ronald Favier's Affidavit.

16. No member of the defendant's Board of Governor's ever complained about the greens during Ronald Favier's tenure as General Manager. See Exhibit 4 of Attorney Hurley's Affidavit, particularly paragraph 5.

17. Ronald Favier's replacement has substantial experience in greens keeping. See Exhibit 5 of Ronald Favier's Affidavit.

18. Other than golf course maintenance, Ronald Favier's younger replacement's duties are "basically" the same as Mr. Faviers. See page 47, lines 1-5 of Exhibit 3 of Attorney Campion's Affidavit.

19. Handwritten on a document written by the Board of Governors is the Statement: "Not a financial Q." See Exhibit 7 of Attorney Hurley's Affidavit.

20. President Michael Kaminski's report to the Department of Employment and Training falsely states that Mr. Favier was terminated due to a "Lack of Work." See Exhibit 6 of Attorney Hurley's Affidavit.

21. President Kaminski's failure to recall the details of the meeting at which the Board of Governors voted to terminate Ronald Favier is not credible. See page 27, lines 3-7 of Exhibit 3 of Attorney Campion's Affidavit., and page 29, lines 15-18; and page 30, lines 15-17.

22. Ronald Favier "got along well with most members, employees, and the Board of Governors." Exhibit 3, paragraph 3 of Attorney Hurley's Affidavit, enclosing a copy of Peter Boeing's Affidavit.

23. At the defendant's annual meeting in January of 2003, after the plaintiff's termination, President Michael Kaminski praised Ronald Favier and his work performance. See Exhibit 5, paragraph 4 of Attorney Hurley's Affidavit, a copy of Robert Nowd's Affidavit.

## PLAINTIFF'S RESPONSES TO THE DEFENDANT'S ALLEGATIONS OF UNDISPUTED FACTS

1. Maynard Country Club is a semi-private, 9 hole golf course golf club located in Maynard, Massachusetts that is overseen and managed by a volunteer Board of Governors (the "Board"). (Affidavit of Michael Kaminski, ¶ 1).

RESPONSE: Admit, except that the "volunteers" receive a reduction in their club fees.

2. Mr. Favier was hired by the Club as the General Manager ("GM") in January 2000. (Deposition of Ronald A. Favier, October 29, 2003, at p. 8.)

RESPONSE: Admit.

3. Mr. Favier was age 52 when he was hired and age 55 when his employment was terminated. (Kam. Aff. ¶3 )

RESPONSE: Admit.

4. Mr. Favier executed an at-will employment agreement setting forth the terms of his employment for a period of up to five years. The at-will employment agreement contained a 30-day notice termination clause. A true copy of the Employment Agreement between the Maynard Country Club and Ronald A. Favier is attached to the Kam. Aff. as Exhibit 3.

RESPONSE: Admit as to a true copy of the agreement. Objection to the remainder as it improperly calls for a legal conclusion. Furthermore, said agreement speaks for itself.

5. The Club never employed twenty (20) or more employees for twenty or more weeks during Mr. Favier's employment. (Kam. Aff. ¶ 15).

RESPONSE: After due inquiry, the plaintiff is unable to admit or deny and must thus leave the defendant to its proof.

6. Mr. Favier offered his resignation on the first day of his first golf season with the Club. "I offered my resignation...right when I started". (Pl. Dep. at 131).

RESPONSE: Admit, but this was in 2000. (Pl. Dep. at 131).

7. In April 2002, even before the new Board took office, Mr. Favier offered his resignation to his supervisor, the House Committee Chairperson. (Pl. Dep. at 142)

RESPONSE: Admit only as an option, not an actual resignation. (Pl. Dep. at 142)

8. In the Summer of 2002, Mr. Favier offered his resignation because he was working too many hours, and was asked to "do all these reports". Further, he stated that "if things keep up, you know, I can't work under these conditions." (Pl. Dep. at 132).

RESPONSE: Admit as to considering resignation but Denied as to actually resigning.

9. Mr. Favier offered his resignation when working under each of his House Committee Chairpersons. (Pl. Dep. at 131, 132, 142)

RESPONSE: Admit as to considering resignation but Denied as to actually resigning.

10. Over the span of nine months from April 2002 through December 2002, Mr. Favier threatened to quit his job numerous times, including at least twice to Mr. Kaminski (Kam. Dep. at 56-57, 194), two times to Ms. Ford (Deposition of Joan Ford, dated January 12, 2004 at 18), and in writing to Peter Boeing (former House Committee Chairperson). *See* letter dated April 11, 2002 from Ronald A. Favier to Peter Boeing, annexed to the Campion Aff. as Exhibit 5.

RESPONSE: Denied as to "numerous." Please see the Plaintiff's deposition.

11. At no time in connection with these threats to quit, did Mr. Favier state that he believed he was being discriminated against on account of his age, or any other basis. (Kaminski Aff. ¶ 21). On each occasion, his stated reason for quitting related to the demands of his job. (pl. Dep. at 132).

RESPONSE: Admit, inasmuch as the affidavit and deposition of Patricia Triska were unknown to the plaintiff at the time of his termination or deposition.

12. The Board of Governors (the "Board") met monthly to discuss any issues related to the Club, receiving status reports from various individuals regarding the operations and financial health of the Club. (Kam. Aff. ¶ 5).

RESPONSE: Admit.

13. At Board meetings, the full Board was presented with status reports on the activity and finances of the House (the main Club, excluding the golf course). (Kam. Aff. ¶¶ 5-6)

RESPONSE: Admit.

14. The status reports were intended to present the Board with a picture of the activity, operations and financial health of the House. The status reports were relied upon by the Board in making business decisions regarding the overall success and profitability of Club activities. (Kam. Aff. ¶ 7)

RESPONSE: Admit as to the first sentence. Denied as to the second sentence as the Plaintiff does know whether each Board member relied about same.

15. Prior to the new Board elections in 2002, the House Committee Chairperson never requested that Mr. Favier prepare any types of financial reports, rather leaving it to Mr. Favier's discretion what financial reports he chose to present. (Deposition of Michael Kaminski, November 6, 2003, at 74- 75; Kam. Aff. ¶ 8).

RESPONSE: Denied. See paragraph four of Exhibit 5 to Attorney Hurley's Affidavit.

16. While under Mr. Boeing's supervision, Mr. Favier admitted that his assistant manager probably "knew more about managing then I do" [ sic] and, that " I may not be a good manager." *(See* 5/13/01 letter from Ronald A. Favier to Dawn Anderson dated May 13, 2001, ... attached to the Campion Aff. as Exhibit 6)

RESPONSE: Admit, that this was said in 2001.

17. The Board is elected by the Club's membership. In April 2002, the Club held elections for the Board's President and Treasurer. The membership elected a new President (Michael Kaminski) and new Treasurer (Joan Apkin). (Kam. Dep. at 11).

RESPONSE: Admit.

18. When the new Board was elected in 2002, Mr. Favier's relationship and interaction with the Board changed "dramatically." (Pl. Dep. at 40).

RESPONSE: Admit as to after the said Board was elected.

19. The new executive board members were committed to bringing the operations of the Club to a higher level of professionalism and business standards, with a renewed dedication to running a cost efficient club and with particular attention to lowering the existing debt and implementing new procedures and policies to attain these goals. (Kam. Dep. at 149) *See* also copy of Board members' ideas regarding moving the Club in a more professional direction, attached to the Campion Aff. as Exhibit 7. Mr. Favier was aware of the new direction in which Mr. Kaminski and the Board wanted to take the club. (Pl. Dep. at 43)

RESPONSE: Admit, and the plaintiff was a cooperative participant. See, e.g., Exhibit 3 of Mr. Favier's Affidavit, under section 8.

20. Mr. Kaminski, as President of the Club, appointed a new House Committee Chairperson, Jane Ford, a general Board member. (Kam. Dep. at 32,33; Kam. Aff. ¶ 7) In addition to her supervisory role over Mr. Favier, Ms. Ford was responsible for working cooperatively with the new Treasurer, Joan Apkin, to identify ways that the Club could run more

cost effectively and efficiently. As a result of this, both she and Ms. Apkin were required to work closely with, and to scrutinize, Mr. Favier's job performance to achieve these business goals. (Kam. Aff. ¶ 7)

RESPONSE: Denied. According to President Kaminski, the House Committee Chair was the supervisor of the plaintiff. See Exhibit 1 of Mr. Favier's Affidavit.

21. According to Mr. Favier, he was "criticized all the time" by the new Board. He testified that "there was just a feeling that I couldn't do anything right there, you know. " (Pl. Dep. at 42)

RESPONSE: Admitted as to first sentence; however the second sentence does not appear on page 42. (Pl. Dep. at 42).

22. One at least one occasion, Mr. Favier was counseled by Ms. Ford that he did not have adequate house staff. (Pl. Dep. at 135)

RESPONSE: Admit as to one occasion only.

23. On another occasion, Ms. Ford counseled Mr. Favier that he did not properly manage the preparations for a large member function. (Pl. Dep. at 142)

RESPONSE: Denied. (Pl. Dep. at 142.)

24. On yet another occasion, at a club members' luncheon, Ms. Ford and Ms. Apkin updated members regarding the performance of Club employees. They mentioned employees by name who were doing a great job and did not mention Mr. Favier's name. Mr. Favier was present to hear these remarks. (Pl. Dep. at 42).

RESPONSE: Denied. After being questions, Ms. Ford explicitly include Ronald Favier in her praise. (Plaintiff's Deposition at page 42, line 18).

25. Ms. Ford assumed some of Mr. Favier's responsibility of providing the Board with status reports on the House. (Kam. Aff. ¶ 11) Mr .Favier was responsible for preparing

financial reports regarding the activities of the House so that she could prepare the report for the Board. (Kam. Aff. ¶ 11)

    RESPONSE: Admit that House Ford assumed some responsibility to lighten the Plaintiff's workload: "Please note that my intent is [to] take some admin [sic] pressures [off] of you." Exhibit 2 to Ronald Affidavit's Affidavit, after section 6.

    26.    Ms. Ford started demanding "a lot" of reports from Mr. Favier and he testified that he "couldn't deliver them as quickly as she wanted them." When asked why Ms. Ford may have "piled on" reports, Mr. Favier testified that he "couldn't go inside her head" and that he "really [didn't] know." (Pl. Dep. at 68)

    RESPONSE: Admit that the Plaintiff is not a mind reader. (Pl. Dep. at 68).

    27.    Mr. Favier did not complete the reports as requested, and when he asked for a delay of the Board's expectation until after the golf season, the Board did not want to wait for the financial reports and "kept the pressure on". (Pl. Dep. at 42)

    RESPONSE: Denied. The reports were completed. See paragraph 21 of Mr. Favier's affidavit.

    28.    Instead of preparing the report as directed, Mr. Favier instead stated, "I'll get it to you when I can" or "Why do you need it now?" (Kam. Dep. at 65-66)

    RESPONSE: Denied. See paragraph 21 of Mr. Favier's affidavit.

    29.    When Ms. Ford directed Mr. Favier to provide her with information or reports, "If I [Mr. Favier] thought it was wrong, what she requested, I stated that I didn't think it was right." Mr. Favier acknowledged that this practice "didn't add to the pleasantries of the situation." (Pl. Dep. at 40) The reports Mr. Favier did prepare inaccurately calculated the Club's operating costs. (Kam. Dep. at 70-71)

    RESPONSE: Admit as to deposition testimony; Denied as to the accuracy of the reports. See section 4 of Exhibit 3 of Mr. Favier's affidavit.

30. In October 2002, Ms. Ford counseled Mr. Favier that he had broken the Club's safety policy by allowing golfers to tee off from the first and fourth tees at the same time. (Pl. Dep. at 70-72)

RESPONSE: Denied. The Plaintiff does not see the word "safety" used at sade pages. (Pl. Dep. at 70-72.

31. Ms. Ford counseled Mr. Favier regarding maintaining the golf carts in a new location because of insurance liability issues. (Pl. Dep. at 66)

RESPONSE: Admit; and Ronald Favier moved said golf carts. (Pl. Dep. at 66)

32. Nearly all of Mr. Favier's management reports were incomplete and/or inaccurate, including reports reflecting the financial results of various Club functions and tournaments. (Kam. Dep. at 68-69)

RESPONSE: Denied. See section 4 of the 3rd exhibit of Ronald Favier's Affidavit.

33. Mr. Favier testified that he believed Ms. Apkin "didn't think [he] ran a good restaurant, a good lounge, good bar, didn't get enough money for [his] things." (Pl. Dep. at 82) He acknowledged that "we [Mr. Favier and the Board] may have had differing viewpoints" regarding the financial aspects of running the Club. Id.

RESPONSE: Admit as to <u>conjecture</u> only, made before Ms. Triska's affidavit (Line 8 of Mr. Favier's deposition.)

34. Employees made complaints to Mr. Kaminski regarding Mr. Favier's management of the Club. Specifically, the Club's cook complained about Mr. Favier's lack of direction, and a pro-shop employee complained that Mr. Favier constantly changed her hours and reprimanded her while allowing others to get away with the same conduct. (Kam. Dep. at 95-96) Additionally, Ms. Ford was concerned with allegations that Mr. Favier was having an affair with one of his employees, which she considered unprofessional behavior. (Ford Dep. at 34) Further,

Mr. Kaminski was concerned that Mr. Favier did not adequately handle difficult or confrontational situations with employees or members. He believed that Mr. Favier had a difficult time when asking members to follow the rules and when disciplining employees. He also believed that Mr. Favier was not respected by the Club's employees. (Kam. Dep. at 85-86)

RESPONSE: Denied. See paragraph 8 of Mr. Favier's deposition.

35. Ms. Ford and Ms. Apkin confronted Mr. Favier in August 2002 regarding a complaint they received regarding his management of the Club. Mr. Favier refused to comply with their request that he prepare a written response to the allegations. (Pl. Dep. at 80-81)

RESPONSE: Denied. Mr. Favier's best memory is that he did so comply. (Plaintiff's Deposition at 81)

36. Ms. Ford testified that Mr. Favier did not understand the basic concept of pricing items. (Ford Dep. at 15) Prices of Club items (such as food and alcohol) consistently fell below the market rate charged by similar clubs and restaurants in the area because Mr. Favier did not factor in the cost to buy and service the item when setting the item's price. (Kam. Dep. at 70) Mr. Favier's inability to allocate the cost of items resulted in a loss of profits to the Club. (Ford Dep. at 14-15)

RESPONSE: Denied. The deposition testimony speaks for itself and is not accurately cited. (Ford Dep. At 14-15)

37. In the golf season of 2002, Mr. Kaminski personally observed that Mr. Favier would complain to Board members when they requested that he prepare reports, make a repair, or replace fire detectors, stating that he did not have the time to complete the requests. (Kam. Dep. 76-78)

RESPONSE: Denied. See paragraphs 4 and 5 of Exhibit 5 to Mr. Favier's Affidavit.

38. Mr. Kaminski also observed that Mr. Favier, who was responsible for maintaining the security of the Club's two safes, hung the key to one safe on a hook which was accessible to

anyone inside the Club's office, and he kept the combination for the other safe posted in a location visible to anyone inside the Club's office. (Kam. Dep. at 67, 78, 82-83)

RESPONSE: Denied. See paragraph 5 of Exhibit 5 of Mr. Favier's Affidavit.

39. Mr. Favier attempted to provide raises to staff employees without the appropriate authorization from Ms. Ford. Mr. Favier made promises to his staff that he would get them pay raises even though Ms. Ford never said to Mr. Favier that pay increases were in the budget. As a result, Mr. Favier caused an employee to quit because he did not receive the raise Mr. Favier led him to believe he would receive. *See* e-mail between Jane Ford and Ronald A. Favier, with copy to Michael Kaminski, dated September 25, 2002 attached to the Kam. Aff. as Exhibit 2.

RESPONSE: Denied. See paragraph 23 of Mr. Favier's Affidavit.

40. Mr. Favier was not following the Board's budget appropriately. Joan Apkin requested that Jane Ford counsel Mr. Favier to properly adhere to budget line items and not use budget resources allocated for an Assistant Manager for regular course wages. *See* e-mail from Joan Apkin to Jane Ford, dated October 2, 2002 attached to the Campion Aff. as Exhibit 8.

RESPONSE: Denied. Ronald Favier was never over budget. He was not notified of any such alleged improper use of budget resources. See paragraph 8 of Mr. Favier's affidavit.

41. Mr. Kaminski discussed Mr. Favier's performance deficiencies with him formally on one occasion and informally on numerous occasions. (Kam. Dep. at 183-184). In particular, in the summer of 2002, Mr. Kaminski discussed with Mr. Favier his inability to handle management issues on his own, and to accept ownership for problems within the Club. He also discussed with Mr. Favier his spreading rumors among Club members and employees, and his discussing confidential Club matters in front of Club members. (Kam. Dep. at 100-101, 103, 113)

RESPONSE: Denied as to "formally" and as to "numerous." See paragraph 8 of Mr. Favier's affidavit.

42.     By April 11, 2002, almost immediately after the new Board was elected, Mr. Favier was "unhappy" with his position and "frustrated at being micromanaged" (Pl. Dep. at 148)

RESPONSE:   Admit, except that Ronald Favier testified that he "liked doing it [his job]." Pl. Dep. at 148, lines 2-3.

43.     In May or June of 2002, Mr. Favier complained he was working too many hours and that it was not right. (Pl. Dep. at 134) Around the same time, he told Mr. Kaminski that he felt overburdened. (Pl. Dep. at 53-54)

RESPONSE: Admit that the Plaintiff did not believe that 100 hours per week of work was appropriate.  (Pl. Dep. at 134, lines 23 to 24).

44.     Mr. Favier also complained to members that the work demands placed on him by the Board were causing him anxiety and were causing him to work longer hours than he was capable of working. (Kam. Dep. at 102-103)

RESPONSE: Admit that the Plaintiff did not believe that 100 hours per week of work was appropriate.  (Pl. Dep. at 134, lines 23 to 24).  However the Plaintiff cannot locate the reference on the pages provided by the defendant.

45.     Shortly thereafter, Mr. Kaminski moved Mr. Favier's House Committee report to the first item on the Board meeting's agenda so that Mr. Favier could leave early. (Pl. Dep. at 53-54)

RESPONSE: Admit as to moving the report but denied as to the reason.  The Plaintiff had to stay until after the meeting as members would consume alcohol and he was the only authorized person to be there during the consumption of alcohol.  (Pl. Dep. at 54, lines 5-9.)

46.     Mr. Favier informed Ms. Apkin on May 5, 2002 that he had submitted his resignation stating that he could not "take" the "oversight" and "member pressure" anymore. *See* e-mail from Jane Apkin to Board members, including Michael Kaminski, dated May 5, 2002 attached to the Kam Aff. as Exhibit 4.

RESPONSE: Admit as to stating it as an option, due to the harassment of Ms. Apkin. Denied as to actually resigning.

47. In response to a criticism by Ms. McKean, a general Board member, regarding Mr. Favier's management of a Championship Golf Tournament at the Club (regarding the prizes that were awarded), he responded "I guess we could have offered every one a new car or a mink coat, but seeing as there was no entry fee to participate, I think that the club was very generous." "I have personally become despondent over the never ending, constant complaining, about every little thing that goes on here. For reasons that I don't know, you have been riding Rick [an employee of the Club] hard all year, and I think it is unfair. There is never one time that we cross paths that you don't have a complaint about something or someone here. Please take all your future complaints to [the House Committee Chairman]. I can no longer deal with them." *See* e-mail from Ronald A. Favier to Janet McKean dated August 22, 2001 attached to the Campion Aff. as Exhibit 9.

RESPONSE: Admit as to a 2001 document.

48. The Board concluded that Mr. Favier lacked the managerial skills necessary to effectively handle difficult or confrontational employment situations, as well as the skills and willingness to assist the Board usher in new professional and business standards for the Club. (Kam. Aff. ¶15)

RESPONSE: Objection to the use of "The Board" as a whole.

49. The Board held an executive session in October 2002 to vote on whether to exercise the termination clause in Mr. Favier's employment agreement. (Ford Dep. at 10; Kam. Dep. at 16) Of the nine voting members on the Board, eight attended the executive session (ages 39, 41, 49, 50, 54, 58, 65 and 80) and voted by secret ballot. The members voting included: Jane Ford (age 41), Joan Apkin (age 49), Janet McKean, Jane Audrey Neuhauser, Michael Cardillo,

Ted Bubier, Pauline Hendrix, and Bob Sweeney. (Kam. Dep. 19) Mr. Kaminski attended the meeting as well, and participated in the discussion (Kam. Dep. at 51-53)

>RESPONSE: After due inquiry, unknown to the plaintiff and he must thus leave the defendant to its proof. Furthermore, Mr. Kaminski's memory of the meeting is poor.

50.     The Board entered into substantial discussion prior to voting on whether to terminate Mr. Favier's employment agreement. It was a very difficult decision for the Board because while the Board believed, and discussed, the serious concerns they had in several areas of Mr. Favier's responsibility, including that he lacked the skills to execute his responsibilities appropriately, he was well liked by the membership. (Kam. Dep. at 52-53; Kam. Aff. ¶17)

>RESPONSE: Denied as "substantial" as President Kaminski could not remember much of the meeting. See Mr. Kaminski's deposition.

51.     Mr. Kaminski did not recall any discussion of Mr. Favier's age during the substantial discussions leading up to the vote. (Kam. Dep. at 55)

>RESPONSE: Admit that he so testified; he could not remember much of said meeting. (Kam Dep. at 41-42; Mr. Kaminski repeated "I don't recall" ten times during just two pages of his deposition testimony).

52.     Among the concerns discussed by the Board was Mr. Favier's numerous threats to quit his job. (Kam. Dep. at 55-56)

>RESPONSE: Unknown to the plaintiff. President Kaminski could not remember much of said meeting. (Kam Dep. at 41-42; Mr. Kaminski repeated "I don't recall" ten times during just two pages of his deposition testimony).

53.     Ultimately, the vote resulted in seven votes in favor of terminating Mr. Favier's employment contract, and only one vote against termination. (Kam. Aff. ¶13)

>RESPONSE: Unknown to the Plaintiff.

54. Mr. Kaminski informed Mr. Favier on December 16, 2002 that the Board had voted to exercise the Agreement's 30-day termination clause, and to terminate his employment. (Kam. Aff. ¶13, Exhibit 4; Kam. Dep. at 147-148)

RESPONSE: Admit as to informing the Plaintiff of his termination. The remainder is denied.

55. Mr. Favier testified that he was not the only club employee who was criticized for his unsatisfactory work (Pl. Dep. at 37-38,59), and that many employees resigned during Ms. Apkin's tenure as Treasurer because Ms. Apkin was a difficult boss. (Pl. Dep. at 38) In addition, he acknowledged that Ms. Ford's criticism may have stemmed from her desire to make the Club function better. (Pl. Dep. at 66-67)

RESPONSE: Admit as to criticism of other employees; Denied as to resignations. (Pl. Dep. at 66-67).

56. Since the Club employs a relatively small number of employees it does not maintain any formal policies regarding reporting perceptions of discrimination. (Kam. Aff. ¶ 16) However, the President maintains an open door policy and lets each employee know that he or she is free to speak directly with him regarding any perceived problems, including discrimination. (Kam. Aff. ¶ 20)

RESPONSE: Denied.

57. Mr. Favier never complained about age discrimination during his employment with the Club. (Pl. Dep. at 137)

RESPONSE: Admit as he did not have the benefit of Patricia Triska's affidavit or deposition testimony.

58. In fact, Mr. Favier complained to Mr. Kaminski quite often from April 2002 up through his termination regarding his work situation. During those conversations he complained that he felt he was working too many hours, was asked to prepare too many reports, was pulled in too many directions, was frustrated by being micromanaged and was being criticized persistently. Yet during all of the conversations, he never once expressed a belief that he was being treated differently or being discriminated against because of his age. (Kam. Aff. ¶ 21)

> RESPONSE: Admit as he did not have the benefit of Patricia Triska's affidavit or deposition testimony.

59. At no time during Mr. Favier's termination meeting did Mr. Favier mention to Mr. Kaminski that he felt he was being terminated or was treated differently because of his age. (Kam. Aff. ¶1 7)

> RESPONSE: Admit as he did not have the benefit of Patricia Triska's affidavit or deposition testimony.

60. Rather, Mr. Favier testified that he did not believe any action taken by the Board, as to him, except for his actual termination, was taken on account of his age. (Pl. Dep. at 96-98)

> RESPONSE: Admit as he did not have the benefit of Patricia Triska's affidavit or deposition testimony.

61. Mr. Favier admitted in his sworn testimony that he had no reason to believe that age was a motivating factor in the Board's termination of his employment, but "assumed it was [his] age, for lack of another reason." (Pl. Dep. at 97, 110-111)

> RESPONSE: Admit as he did not have the benefit of Patricia Triska's affidavit or deposition testimony.

62. Mr. Favier stated at his deposition that he believed he was terminated because of his age because Mr. Kaminski told him that the Club was going in a "new direction". And in his

mind, "if that was new and I was going and I was old" then "I assumed I was the old way." (Pl. Dep. at 99)

      RESPONSE: Admit.

63.    Mr. Favier stated that he understood that the Board "didn't want [him] as a GM" because "they had other ideas for the club." That is, the Board was going to take the Club "in a new direction" and "I apparently wasn't part of the new direction" (Pl. Dep. at 43-44) Mr. Favier, however, has "no certain knowledge" of why the change occurred. (Pl. Dep. at 44)

      RESPONSE: Admit as he did not have the benefit of Patricia Triska's affidavit or deposition testimony.

64.    Mr. Favier testified that, "there's a possibility I suppose that they were trying to help the club and they saw all these things as being truthful and essential and must be changed." (Pl. Dep. at 63) Further, when asked why the Board would have wanted somebody else in the GM position, the Mr. Favier stated, "Maybe personality conflicts. Maybe I wasn't their cup of tea." (Pl. Dep. at 63-64)

      RESPONSE: Admit as he did not have the benefit of Patricia Triska's affidavit or deposition testimony.

65.    Both Ms. Apkin and Ms. Ford are over forty, and Ms. Ford is within a few years of Mr. Favier's age. (Kam. Aff. ¶ 13)

      RESPONSE: Admit.

66.    Mr. Favier's job as General Manager was eliminated after his termination. The job responsibilities of the General Manager were absorbed into a more expansive position entitled "Business Manager". The Business Manager position is a higher paid position, with the added responsibility of maintaining the golf course. (Kam. Dep. at 44-45; Kam. Aff. ¶18)

      RESPONSE: Denied.

67.    The Club's Business Manager is an individual with over eighteen (18) years experience in golf course and golf club management, as well as sophisticated skills regarding managing club finances. (Kam. Aff. ¶19). *See* Resume of Nathaniel Binns attached to the Kam. Aff. as Exhibit 5. Prior to becoming the General Manager of the club, Mr. Favier, by contrast, had no prior experience managing a golf club. Rather, Mr. Favier had owned and worked in an auto body supply company for at least sixteen years. (Pl. Dep. at 127)

RESPONSE: Denied as to Mr. Binn's golf club management experience. See Exhibit 5 of Ronald Favier's Affidavit.

Ronald A. Favier,

By his Attorney,

Dated: December 20, 2004

_____
Edmund P. Hurley (BBO No. 556019)
Blaine J. DeFreitas & Associates
One Pleasant Street
Maynard, MA 01754
(978) 897-0339